## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                                    :
IN RE PENNEAST PIPELINE              :       First Filed Civ. A. No.: 18-1585
COMPANY, LLC                              :       (See Exhibit A for all Case Numbers)
                                                    :
                                                    :              **OPINION**
                                                    :
_____:

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Plaintiff PennEast Pipeline Company, LLC's ("PennEast") application for orders of condemnation and orders granting preliminary injunctive relief under the federal power of eminent domain pursuant to the Natural Gas Act ("NGA"), 15 U.S.C. § 717f(h), authorizing immediate access to and possession of the rights of way ("Rights of Way") as defined in the respective Verified Complaints in Condemnation of Property Pursuant to Federal Rule of Civil Procedure 71.1[1] (the "Condemnation Application"), for the purpose of "constructing, operating, and maintaining a natural gas transmission pipeline and appurtenant facilities (part of an interstate natural gas transmission system) and conducting all other activities required by the Order of the Federal Energy Regulatory Commission [('FERC' or the 'Commission') issuing certificates ('FERC Certificates')] dated January 19, 2018, [FERC] Docket No. CP15-558-000

_____

[1] PennEast filed verified complaints in over 130 cases related to the properties referenced therein. The Court refers to the filings in this litigation generally and identifies case-specific documents where necessary.

('FERC Order')" (Am. Not. of Condemn. 2; Compl. ¶ 8). PennEast's request is made in advance of any award of just compensation.

In response thereto, upon the request of PennEast, and for good cause appearing, the Court entered an Order to Show Cause[2] ordering Defendants, as defined herein, to show cause why an order for condemnation should not be granted. Due to the number of cases and Defendants, the Court held three show cause hearings—April 5, 2018; April 19, 2018; and April 26, 2018—at which Defendants, both represented and *pro se*, appeared in opposition to PennEast's Condemnation Application. Having heard the arguments of the parties pursuant to Federal Rule of Civil Procedure 78(a), and having carefully reviewed the numerous submissions filed in support of and in opposition to PennEast's application and in response to the Order to Show Cause, for the reasons set forth below and for good cause shown, PennEast's application for orders of condemnation and for preliminary injunctive relief allowing immediate possession of the Rights of Way in advance of any award of just compensation is **GRANTED**. The State Defendants', as defined herein, request for dismissal is **DENIED**.

## I.  BACKGROUND[3]

### A.  The Parties

PennEast is a Delaware limited liability company, duly registered to do business in New Jersey, with its principal place of business in Pennsylvania. (Compl. ¶ 2.) According to FERC, "[u]pon commencement of [its] operations . . . , PennEast will become a natural gas company

---

[2] A subsequent Amended Order to Show Cause was entered allowing PennEast additional time to serve all Defendants.

[3] The majority of the facts herein are a matter of public record. When necessary and appropriate, the Court relies further on the well-pled allegations in the complaints.

within the meaning of section 2(6) of the NGA, and will be subject to [FERC]'s jurisdiction."[4] FERC Order ¶ 3.

Defendants are a collection of individual fee simple owners and interest holders of property (collectively, "Defendants") on which PennEast is seeking to acquire the Rights of Way as described in the respective complaints.[5]

### B. PennEast's Application to FERC and the FERC Order[6]

On September 24, 2015, PennEast filed an application (the "FERC Application") with FERC pursuant to section 7(c) of the NGA and Parts 157 and 284 of FERC's regulations for the construction and operation of a new 116-mile, 36-inch-diameter greenfield pipeline system from Luzerne County, Pennsylvania to Mercer County, New Jersey (sometimes referred to by FERC as the "PennEast Project"). (Compl. ¶ 12); FERC Order ¶ 1. As described in the FERC Order based on the FERC Application:

> PennEast proposes to construct a new greenfield pipeline system to provide up to 1,107,000 [dekatherms per day (Dth/d)] of firm natural gas transportation service to markets in New Jersey, New York, Pennsylvania, and surrounding states. The project extends from various receipt point interconnections with the interstate natural gas pipeline system of Transcontinental Gas Pipe Line Company, LLC (Transco) and with gathering systems in the eastern Marcellus Shale region operated by UGI Energy Services, LLC, Williams Partners, L.P., and Energy Transfer Partners, L.P., to multiple delivery point interconnections in natural gas-consuming markets in New Jersey

---

[4] Section 2(6) defines "[n]atural-gas company" as "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." 15 U.S.C. § 717a(6).

[5] Unless otherwise noted, the Court consolidates Defendants' arguments and addresses them jointly.

[6] As discussed below, this Court does not serve as an appeals court for FERC and therefore does not review the FERC Order in that capacity. *See infra* note 42 and text accompanying note 42. It is summarized here for the benefit of the reader, only.

and Pennsylvania, terminating at a delivery point with Transco in Mercer County, New Jersey. PennEast states that the project is designed to bring lower cost natural gas to markets in New Jersey, Pennsylvania, and New York and to provide shippers with additional supply flexibility, diversity, and reliability.

FERC Order ¶ 4. As part of the FERC Application, PennEast: (1) requested to construct several facilities costing approximately $1.13 billion; (2) stated it executed long-term agreements with several shippers for firm transportation service; (3) requested approval of its *pro forma* tariff; (4) requested "a blanket certificate of public convenience and necessity pursuant to Part 284, Subpart 284 of the [FERC]'s regulations authorizing it to provide transportation service to customers requesting and qualifying for transportation"; and (5) requested "a blanket certificate of public convenience and necessity pursuant to Part 157, Subpart F of the [FERC]'s regulations authorizing certain future facility construction, operation, and abandonment." FERC Order ¶¶ 5-9 (citing 18 C.F.R. §§ 157.204, 284.221).

On October 15, 2015, the FERC Application was published in the Federal Register. *Id.* ¶ 10 (citing 80 Fed. Reg. 62,068 (2015)). In response, FERC granted various motions to intervene, and "[n]umerous entities, landowners, individuals, and New Jersey State representatives filed protests and adverse comments raising the following issues: (1) the need for an evidentiary hearing[7]; (2) the need for the project; and (3) whether the use of eminent domain is appropriate for this project," as well as "numerous comments . . . raising concerns over the environmental impacts of the project." *Id.* ¶¶ 10-12. According to FERC, these issues were either "addressed in

---

[7] FERC denied the request for a trial-type evidentiary hearing, finding it was "necessary only where there are material issues of fact in dispute that cannot be resolved on the basis of the written record" and "the existing written record provides a sufficient basis to resolve the issues relevant to this proceeding." Therefore, FERC held, "The Commission has satisfied the hearing requirement by giving all interested parties a full and complete opportunity to participate through evidentiary submission in written form." FERC Order ¶ 14.

the Final Environmental Impact Statement" ("EIS") or in the FERC Order. *Id.* ¶¶ 11, 12; *see also id.* ¶ 97 n.121 ("All comments received prior to the end of the comment period and in response to the November 4, 2016 letter that included additional substantive concerns are included in the comment responses contained in Appendix M of the final EIS (Volume II). Any new issues raised after December 31, 2016, which were not previously identified, are addressed in this [FERC O]rder.").

On January 19, 2018, after undergoing an extensive review process as discussed herein, the FERC Order was issued authorizing the project and granting PennEast a Certificate of Public Convenience and Necessity, subject to certain conditions. FERC Order ¶ 2. In granting the authorization, FERC found "the benefits that the PennEast Project will provide to the market outweigh any adverse effects on existing shippers, other pipelines and their captive customers, and on landowners and surrounding communities." *Id.* And while FERC agreed "the project will result in some adverse environmental impacts," as concluded by FERC staff in the EIS, it found that, through the conditions imposed, "these impacts will be reduced to acceptable levels." *Id.*

In its 99-page Order[8], FERC detailed the thorough evaluation and review process it used in reaching its decision on the FERC Application. Specifically, FERC evaluated whether "the construction and operation of the facilities" satisfy "the requirements of subsections (c) and (e) of section 7 of the NGA." *Id.* ¶ 15. First, FERC considered the Application of the Certificate Policy Statement and "whether there [was] a need for a proposed project and whether the proposed project will serve the public interest." *Id.* ¶ 16. The Certificate Policy Statement establishes certain criteria for making this determination, and FERC found PennEast "sufficiently demonstrated that there is

---

[8] Inclusive of Appendix A—"Environmental Conditions for the PennEast Pipeline Project."

market demand for the project" and that it "will provide reliable natural gas service to end use customers and the market." *Id.* ¶¶ 16, 28, 36. Therefore, FERC concluded:

> Based on the benefits the project will provide to the shippers, the lack of adverse effects on existing customers, other pipelines and their captive customers, and effects on landowners and surrounding communities, we find, consistent with the Certificate Policy Statement and section 7 of the NGA, that the public convenience and necessity requires approval of PennEast's proposal, subject to the conditions discussed below.

FERC Order ¶ 40.

Next, FERC addressed PennEast's eminent domain authority. Despite arguments that "PennEast is a for-profit company[] and has not shown that there is a genuine need for the project, or that the public it is intended to serve will benefit from it," FERC recognized that, "[i]n constructing [section 7(h) of the NGA], Congress made no distinction between for-profit and non-profit companies." FERC Order ¶¶ 41, 42. Specifically, FERC stated:

> Under section 7 of the NGA, the Commission has jurisdiction to determine if the construction and operation of proposed interstate pipeline facilities are in the public convenience and necessity. Once the Commission makes that determination, it is section 7(h) of the NGA that authorizes a certificate holder to acquire the necessary land or property to construct the approved facilities by exercising the right of eminent domain if it cannot acquire the easement by an agreement with the landowner. . . . Further, as discussed above, need for the project has been demonstrated by the existence of long-term precedent agreements for approximately 90 percent of the project's capacity. Just as the precedent agreements provide evidence of market demand/need, they are also evidence of the public benefits of the project.

*Id.* ¶ 42.

With respect to the requested blanket certificates, FERC observed the objectors took "general issue with the [FERC]'s blanket certificate program" rather than presenting "arguments why PennEast's specific request . . . should be denied." *Id.* ¶ 46. Consequently, FERC granted

PennEast a blanket certificate under Part 157, Subpart F of FERC's regulations, as well as a Part 284, Subpart G blanket certificate, "subject to the [environmental] conditions imposed [in Appendix A of the FERC Order]." *Id.* ¶¶ 43-48.

Additionally, FERC outlined its environmental review process and analysis at length as follows: Prior to entering the FERC Order, on January 13, 2015, FERC staff issued a Notice of Intent to Prepare an EIS for the Planned PennEast Pipeline Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meetings ("NOI"), which "briefly described the project and the [EIS] process, provided a preliminary list of issues identified by staff, invited written comments on the environmental issues that should be addressed in the EIS, and listed the date and location of five public scoping meetings." *Id.* ¶ 93. On February 3, 2015, the NOI was published in the Federal Register and was

> sent to more than 4,300 interested entities, including representatives of federal, state, and local agencies; elected officials; environmental and public interest groups; Native American tribes; potentially affected landowners as defined in the Commission's regulations (i.e., landowners crossed or adjacent to pipeline facilities or within 0.5 mile of a compressor station); concerned citizens; and local libraries and newspapers.

*Id.* In response, "more than 6,000 letters were filed," and "250 speakers provided verbal comments" at the public scoping meetings, which were held between February 10 and 12, 2015 and February 25 and 26, 2015 in Bethlehem, Jim Thorpe, and Wilkes-Barre, Pennsylvania; and Trenton and Hampton, New Jersey. *Id.* ¶ 93 & n.115.

Pursuant to requirements of the National Environmental Policy Act ("NEPA"), and with the cooperation and participation of the U.S. Army Corps of Engineers, U.S. Environmental Protection Agency, and the U.S. Department of Agriculture's Natural Resources Conservation Service, FERC staff issued the draft EIS for the project on July 22, 2016. *Id.* ¶ 94. Notice was

again published in the Federal Register allowing public comment, and "[t]he draft EIS was mailed to over 4,280 stakeholders, which included the entities that were mailed the NOI and additional interested entities." *Id.* ¶ 95. Six public comment sessions were held between August 15 and 17, 2016, where approximately 670 individuals were in attendance, 420 of which provided verbal comments. *Id.* Additionally, "[a] total of 4,169 comment letters were filed in response to the draft EIS before the comment period closed on September 12, 2016." *Id.*

In response, PennEast filed route modifications "to address environmental and engineering concerns." *Id.* ¶ 96. Newly affected landowners received notice of the change and were invited to comment. *Id.*

On April 7, 2017, FERC issued the final EIS "address[ing] all substantive comments received on the draft EIS, the November 4, 2016 letter, and comments received prior to December 31, 2016," and, on April 14, 2017, a public notice was published in the Federal Register. *Id.* ¶ 97 & n.121. Significantly, the FERC Order summarized and affirmed the final EIS as follows:

> 98. The final EIS concludes that while the project will result in some adverse environmental impacts, these impacts will be reduced to less than significant levels with the implementation of PennEast's proposed impact avoidance, minimization, and mitigation measures, together with staff's recommended environmental conditions, now adopted, as modified, as conditions in the attached Appendix A of this order. While, the Commission recognizes that there are incomplete surveys due to lack of access to landowner property, the conclusions in the final EIS, and affirmed by the Commission here, were based on the information contained in the record, including PennEast's application and supplements, as well as information developed through Commission staff's data requests, field investigations, the scoping process, literature research, alternatives analysis, and contacts with federal, state, and local agencies, as well as with individual members of the public. As part of its environmental review, staff developed specific mitigation measures that we find will adequately and reasonably reduce the environmental impacts resulting from the construction and operation of the PennEast Project. We believe that the substantial

environmental record and mitigation measures sufficiently support reaching a decision on this project.

99. Once a certificate is issued, the Commission's environmental staff is charged with ensuring that the project will be constructed in compliance with the Commission's order, including the conclusions regarding the project's expected impacts upon the environment. Recognizing that there are necessary field surveys that are outstanding on sections of the proposed route where survey access was denied, we are imposing several environmental conditions that require filing of additional environmental information for review and approval once survey access is obtained. This includes items such as site-specific plans, survey results, documentation of consultations with agencies, and additional mitigation measures. The additional information ensures the EIS's analyses and conclusions are verified based on the best available data, enabling us to improve and finalize certain mitigation plans and ensure stakeholder concerns are addressed. The information will also provide Commission staff with the site-specific details necessary to appropriately evaluate compliance during the construction process. In addition, Environmental Condition 10 requires that before construction can commence, PennEast must file documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

100. Further, the final EIS has adequately identified, as required by section 1502.22 of the Council on Environmental Quality (CEQ) regulations, where information is lacking. CEQ regulations recognize that some information simply may not be available. Moreover, the final EIS contains mitigation plans that provide for using the correct mitigation measures, sediment control measures, and restoration requirements based on the actual site conditions experienced during construction. The conditions in the order will ensure that all environmental resources will be adequately protected.

101. The Commission needs to consider and study environmental issues before approving a project, but it does not require all environmental concerns to be definitively resolved before a project's approval is issued. NEPA does not require every study or aspect of an analysis to be completed before an agency can issue a final EIS, and the courts have held that agencies do not need perfect information before it takes any action. In *U.S. Department of the Interior v. FERC*, [952 F.2d 538, 546 (D.C. Cir. 1992),] the court held that "[v]irtually every decision must be made under some uncertainty; the question is whether the Commission's response, given uncertainty, is supported by substantial evidence and is not

arbitrary and capricious." Similarly, in *State of Alaska v. Andrus*, [580 F.2d 465, 473 (D.C. Cir. 1978),] the court stated that "[i]f we were to impose a requirement that an impact statement can never be prepared until all relevant environmental effects were known, it is doubtful that any project could ever be initiated." There must, however, be sufficient information in the record to enable the Commission to take the requisite "hard look" required by NEPA. As indicated above, we believe the record in this proceeding meets that requirement.

*Id.* ¶¶ 98-101 (footnotes omitted).

The FERC Order went on—for over 40 pages—to address the major environmental issues raised with respect to the EIS, namely: (1) geology; (2) soils; (3) water resources; (4) wetlands; (5) vegetation, forested land, and wildlife; (6) threatened, endangered, and other special status species; (7) land use, recreation, and visual resources; (8) socioeconomics; (9) cultural resources; (10) air quality impacts; (11) noise; (12) safety; (13) upstream and downstream impacts; and (14) alternatives. *Id.* ¶¶ 104-215. Ultimately, FERC modified and adopted the recommendations in the final EIS and included them as environmental conditions to the FERC Order, "find[ing] that the project is in the public convenience and necessity" but noting "[c]ompliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analyses." *Id.* ¶¶ 216-17. Additionally, FERC stated that "state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate" and that "this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission." *Id.* ¶ 218. In the end, FERC ordered:

(A) A certificate of public convenience and necessity is issued to PennEast, authorizing it to construct and operate the proposed PennEast Project, as described and conditioned herein, and as more fully described in the application.

(B) The certificate authority issued in Ordering Paragraph (A) is conditioned on:

(1) PennEast's proposed project being constructed and made available for service within two years of the date of this order pursuant to section 157.20(b) of the Commission's regulations;

(2) PennEast's compliance with all applicable Commission regulations, particularly the general terms and conditions set forth in Parts 154, 157, and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations; and

(3) PennEast's compliance with the environmental conditions listed in Appendix A to this order.

(C) A blanket construction certificate is issued to PennEast under Subpart F of Part 157 of the Commission's regulations;

(D) A blanket transportation certificate is issued to PennEast under Subpart G of Part 284 of the Commission's regulations;

(E) PennEast shall file a written statement affirming that it has executed firm contracts for the capacity levels and terms of service represented in signed precedent agreements, prior to commencing construction.

(F) PennEast's initial rates and tariff are approved, as conditioned and modified above.

(G) PennEast is required to file actual tariff records reflecting the initial rates and tariff language that comply with the requirements contained in the body of this order not less than 30 days and not more than 60 days prior to the commencement of interstate service consistent with Part 154 of the Commission's regulations.

(H) As described in the body of this order, PennEast must file any negotiated rate agreement or tariff record setting forth the essential terms of the agreement associated with the project at least 30 days, but not more than 60 days before the proposed effective date of such rates.

(I) No later than three months after the end of its first three years of actual operation, as discussed herein, PennEast must make a filing to justify its existing cost-based firm and interruptible recourse rates. PennEast's cost and revenue study should be filed through the eTariff portal using a Type of Filing Code 580. In addition, PennEast is advised to include as part of the eFiling description, a

reference to Docket No. CP15-558-000 and the cost and revenue study.

(J) The requests for an evidentiary hearing are denied.

(K) PennEast shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies PennEast. PennEast shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

*Id.* at 82-83.

### C. Verified Complaints

On February 6, 2018, PennEast filed complaints against Defendants, verified by Jeffrey England of UGI Energy Services, LLC as Project Manager, Project Management and Construction, on behalf of PennEast, asserting claims related to the respective properties for: (1) award of possession by eminent domain pursuant to the NGA, 15 U.S.C. § 717f(h); (2) determination of just compensation; and (3) preliminary and permanent injunctive relief allowing

immediate possession and entry onto the Property, in advance of any award of just compensation, in order to construct, operate, and maintain an interstate natural gas transmission pipeline and appurtenances as approved by FERC, and enjoining Defendants and his/her agents, servants, and representatives from interfering in any way with the construction of the pipeline, including, without limitation, land surveys, tree-clearing, excavation, trenching, pipe laying, and post-construction restoration.

(Compl. ¶¶ 1, 35-41.) In support, PennEast contends (1) the FERC Order authorizes it to install the pipeline, (2) the Rights of Way for the respective property were "reviewed and approved by [the] FERC prior to the issuance of the FERC Order," and (3) the Rights of Way "are necessary to construct, install, operate, and maintain the pipeline facilities approved in the FERC Order." (*Id.* ¶¶ 18-21.) Further, PennEast alleges it offered to pay the landowners at least $3000 for the Rights of Way and attempted several times, through its land agent Western Land, to negotiate in good

faith for the acquisition of the Rights of Way for the properties but was unable to acquire same. (*Id.* ¶¶ 29-30, 32.) Consequently, it argues it has satisfied the conditions required to exercise eminent domain under Section 7(h) of the NGA and is therefore entitled to immediate possession. (*Id.* ¶ 34.)

### D. Order to Show Cause

On February 14, 2018, having reviewed the complaints and exhibits attached thereto, the Court entered an Order to Show Cause why an order should not be entered:

> 1. Determining that PennEast has satisfied all of the statutory requirements of the Natural Gas Act, 15 U.S.C. § 717f(h) and is duly vested with the authority to condemn the Rights of Way as defined in the Verified Complaint;
>
> 2. Granting PennEast's application for an Order of Condemnation of the Rights of Way;
>
> 3. Finding that PennEast is entitled under the equitable powers of the Court to a preliminary injunction in the form of an order for immediate access to and possession of the property rights being condemned.
>
> 4. Requiring PennEast to post appropriate security in the form of a surety bond or other undertaking as the Court may direct into the Court's Registry pursuant to Local Civil Rule 67.1(a).
>
> 5. Finding that upon this deposit with the Court, PennEast is authorized to immediately enter and take possession of the Rights of Way for all purposes allowed under the Federal Energy Regulatory Commission's Order granting PennEast a Certificate of Public Convenience and Necessity, including, without limitation, the performance of survey activities required by the FERC to be completed before construction of the pipeline may commence.

(Order to Show Cause 2-3; Am. Order to Show Cause 2-3; *see supra* note 2.) Public hearings on the Order to Show Cause were held on three dates: April 5, 2018; April 19, 2018; and April 26,

2018.[9] The Order to Show Cause also set forth a deadline,[10] prior to the hearings, for any interested party to file any papers responsive to the Order to Show Cause. (*Id.* at 3.) PennEast was permitted, by way of the Order to Show Cause, to respond to any opposition it received. (*Id.*)

### E. Responses to the Order to Show Cause[11]

#### i. Opposition by the State Defendants and Mercer County[12]

Appearing as Defendants in over twenty cases, the State, the Department of Environmental Protection (the "DEP"), the Delaware and Raritan Canal Commission, and the State Agriculture Development Committee (collectively, the "State Defendants") filed briefs in opposition to PennEast's requested relief and seeking dismissal of the complaints. (*See generally* State Defs.' Br.) The State Defendants argue the State is entitled to Eleventh Amendment immunity and therefore, this Court does not have jurisdiction. The State contends it is a necessary party for determining just compensation, and therefore, they ask the Court to "refrain from proceeding with

---

[9] Due to the volume of complaints, the Court assigned a hearing date of April 5, 2018, or April 19, 2018, to Defendants based on their property's docket number (*see* Am. Order 2), with the final April 26, 2018 hearing date being used as a catch-all. While the Defendant's specific hearing date was set forth in his or her Order to Show Cause, all interested property owners were permitted to comment at any hearing at which they appeared. In preparation for the hearings, PennEast was ordered to provide the Court with a master case list. (*See* Text Order dated March 23, 2018.)

[10] This deadline initially included the time by which Defendants had to file their answers. If and when requested, Defendants were granted an extension for time to answer or respond to the complaints, but the date by which to file papers in response to the Court's Amended Order to Show Cause was not extended by way of that extension. In light of the State's jurisdictional challenges, their deadline to answer was tolled pending the Court's decision regarding jurisdiction.

[11] Many parties' arguments overlap or are common among briefs. For the sake of brevity in what is already a complex matter, the Court highlights novel portions of each brief and discusses the arguments *infra* as necessary.

[12] Mercer County joined the State Defendants' arguments to the extent applicable, *e.g.*, they did not (and could not) argue they were entitled to Eleventh Amendment immunity.

any condemnation related to these properties." (State Defs.' Br. 1.) Alternatively, the State Defendants assert the actions should be dismissed because PennEast has failed to meet its burdens both under the NGA and for injunctive relief. Specifically, they argue New Jersey has a public policy of protecting its open space and farmland and, under the New Jersey Constitution, tax dollars are set aside to preserve same. The State Defendants point to several programs they contend evidence how highly they value this "long-held polic[y]," including programs supported by the DEP and the State Agriculture Development Committee ("SADC"). (*Id.* at 5-7.) The State Defendants claim a preliminary injunction is premature given the ongoing FERC proceedings and the likelihood that the pipeline route could change, causing unnecessary condemnation. (*Id.* at 37-45.)

### ii. Opposition by the Stark Defendants[13]

Stark & Stark filed notices of appearance and oppositions in over eighty cases on behalf of Hunterdon County, West Amwell Township, Hopewell Township, Delaware Township, Alexandria Township, the New Jersey Conservation Foundation ("NJCF"), the Hunterdon Land Trust Alliance ("Hunterdon Land Trust"), and dozens of private property owners (collectively, the "Stark Defendants"). The Stark Defendants' briefs are largely consistent. They join the arguments of the State Defendants but additionally argue, *inter alia*, "PennEast does not hold a final FERC Certificate of Public Convenience and Necessity upon which it could ask this Court to determine that it possesses a right to condemn," constituting an improper taking under the Fifth Amendment. (Stark Defs.' Br. 1.) Further, the Stark Defendants contend PennEast is improperly attempting a "quick-take or immediate possession" in contravention to the NGA, where, instead, "PennEast

---

[13] The Columbia Environmental Law Clinic serves as co-counsel for the Hunterdon Land Trust and the New Jersey Conservation Foundation.

should have moved by Summary Judgment to obtain an order of condemnation declaring that it has the substantive right to condemn prior to receiving preliminary injunctive relief to gain access to the property." (*Id.* at 8.)

### iii. Opposition by the McKirdy Riskin Defendants[14]

McKirdy Riskin, Olson & Della Pelle ("McKirdy Riskin") filed opposition briefs in approximately eight cases on behalf of property owners (the "McKirdy Riskin Defendants").[15] They argue PennEast failed to comply with state substantive law, PennEast failed to negotiate, and that the McKirdy Riskin Defendants were denied substantive due process rights because the parcel map and description is unclear as to the parcel to be acquired.[16] (*See generally* McKirdy Riskin Defs.' Br.)

### iv. Cole of Hopewell

Cole of Hopewell Township, NJ, LLC ("Cole of Hopewell") (Dkt. Nos. 18-1951 and 18-1976), represented by Giordano, Halleran & Ciesla, filed a brief in opposition, joining the arguments of Hopewell Township, the State Defendants, and Mercer County, arguing PennEast is not entitled to injunctive relief.

---

[14] McKirdy Riskin also filed non-contesting answers in several cases on behalf of individual property owners.

[15] *See, e.g.,* Dkt. Nos. 18-1722, opposition filed o/b/o Joseph and Adela Gugiotta; 18-1771 (having since been resolved), filed o/b/o Philip and Linda Snyder; 18-1779, filed o/b/o Richard and Elizabeth Kohler; 18-1798, filed o/b/o Carl and Valarie Vanderborght; 18-1853, filed o/b/o Jacqueline Evans; 18-2014, filed o/b/o Dan and Carla Mackey; 18-2028, filed o/b/o Frank and Bernice Wahl; and 18-2508, filed o/b/o Foglio and Assocs. LP (in this matter, Decotiis, Fitzpatrick, Cole & Giblin, LLP serves as conflict counsel for PennEast).

[16] The Court notes the Kohlers, for example, are not opposed to "allow[ing] PennEast access to the Property on reasonable notice and conditions to conduct all necessary environmental, cultural, and species surveys required under the FERC Certificate." (*See, e.g.*, Kohler Br. 2 n.1.)

##### v.   Opposition by the Township of Kingwood

The Township of Kingwood, represented by Lavery, Selvaggi, Abromitis & Cohen, filed opposition to PennEast's request for an injunction and joined the arguments of Hunterdon Land Trust. (*See* Dkt. Nos. 18-1638, 18-1855, 18-1995.)[17]

##### vi.   Answer and Statement of Objections filed by Holland Township

In approximately six cases, Gebhardt & Kiefer, on behalf of Holland Township, filed Answers with counterclaims, asserting PennEast is in violation of the Takings Clause and the Due Process Clause of the Fifth Amendment. Holland Township contends "[t]his Court is not bound by the FERC's findings based upon an incomplete record and/or unconstitutional practice of conferring eminent domain authority without looking beyond precedent agreements." (Holland Stat. of Obj. ¶¶ 3-4.)

##### vii.   Answer and Affirmative Defenses by Mark G. Korman 2007 Residence Trust

The Mark G. Korman 2007 Residence Trust (the "Korman Trust") (Dkt. No. 18-1814), by and through its attorneys Piro, Zinna, Cifelli, Paris & Genitempo, filed an answer with affirmative defenses, contending PennEast "failed to negotiate in good faith for access to survey the Korman Property in that [PennEast] refused to use a licensed surveyor for activities." Further, but without explanation, the Korman Trust asserts a defense of lack of subject matter jurisdiction and that the claims are barred by the doctrines of waiver, estoppel, and unclean hands. (Korman Ans. 10.)

##### viii.   Consent by Jersey Central Power & Light

Jersey Central Power & Light Company ("JCP&L") is named as a Defendant in over 110 cases as either an "'[i]nterest [h]older' by reason of JCP&L's interest in an easement of right of

---

[17] The Township of Kingwood was named and later dismissed in several other cases.

way in the [named p]roperty . . . or [] a [l]andowner by reason of JCP&L's fee simple interest in the [named p]roperty." (Consent Order 1.) By way of Consent Order, which was submitted by JCP&L and entered by the Court, JCP&L agreed to allow access to PennEast "for the purposes of performing non-invasive surveys and studies in furtherance of PennEast obtaining requisite governmental permits and approvals for its construction of the [p]roject." (*Id.* ¶ 1.) Further, the parties agreed to "exercise good faith, diligent efforts to (i) determine whether the proposed location of the PennEast pipeline in the [p]roject through [the named property] shall involve any overlapping co-location with [JCP&L's interest in the named property] and (ii) enter an appropriate encroachment consent agreement with respect to [JCP&L's property interest]." (*Id.* ¶ 2.) PennEast also agreed that, pending execution of an encroachment consent agreement, it would not "file or record a declaration of taking . . . and shall not commence any construction." (*Id.* ¶ 4.) To date, the parties have not reached an agreement and continue to extend the time period by which they shall enter into an encroachment consent agreement. (*See* Consent Order dated November 16, 2018 (extending agreement to December 17, 2018).)

### ix.  Consent by Verizon

Verizon New Jersey Inc. and Cellco Partnership d/b/a Verizon Wireless ("Verizon") was named as a Defendant in approximately twenty complaints, in which JCP&L is also listed as Defendants. Following suit, Verizon requested, and PennEast agreed to, similar protections as JCP&L, allowing PennEast access to the properties to perform non-invasive surveys and studies. (Verizon Ltr. dated March 22, 2018; PennEast Ltr. dated March 28, 2018.) Verizon has since been voluntarily dismissed from all matters in which it was a named Defendant.[18]

---

[18] PennEast has also been able to resolve AT&T's interest in several properties.

### x. Additional Represented Property Owners

The Court received opposition from several represented property owners:

- By Gaetano De Sapio, Esq. o/b/o himself (Dkt. No. 18-1809) and the Estate of Anthony De Sapio, Anthony De Sapio, Jr., Martin De Sapio, and James De Sapio (Dkt. No. 18-1806) (collectively, the "De Sapio Defendants"). The De Sapio Defendants allege they were not properly served, if at all, with the summons and complaint, nor were they furnished with an appraisal from which they could attempt to negotiate. Beyond that, their opposition largely mirrors the Stark Defendants'.

- By Hill Wallack o/b/o Philip and Suzanne Muller ("Mullers")[19] (Dkt. No. 18-1915). The Mullers argue the NGA "does not authorize private gas companies to utilize so-called 'quick-take' procedures" and that PennEast is not entitled to an order allowing the properties to be patrolled by armed federal marshals. (Muller Br. 13, 17.) The Mullers further contend bond, if required, should be at least equal to the fair market value of the specified property. (*Id.* at 19.)

### xi. *Pro Se* Property Owners

The Court received and reviewed oppositions from the following *pro se* Defendants:

- Janet Mowder (Dkt. No. 18-1656)

- Raymond Aron Jr., in the form of an answer and request for dismissal (Dkt. No. 18-1801)

- Leonard and Sharon Goins (Dkt. No. 18-1996)

- Michael and Maureen Santoro, and Thomas and Barbara Callahan (Dkt. No.

---

[19] The Mullers are now represented by McKirdy Riskin.

18-2016)

- Lydia Gombosi, Lana Salsano, and Lydia Dunne (Dkt. No. 18-1621)

**F. Public Hearings on the Orders to Show Cause**

Each of the hearings on the Orders to Show Cause generally proceeded the same way: First, PennEast was permitted to address the Court, followed by Defendants represented by counsel. Next, any property owner in attendance was permitted to address the Court, giving first priority to any party who had filed an opposition. PennEast was permitted to respond. At each subsequent hearing, the Court advised counsel they need only supplement their prior arguments.[20]

Based on this procedure, at the April 5, 2018 hearing, following arguments by PennEast and counsel for Defendants[21], the Court opened the floor to individual Defendants wishing to address the Court. No individuals came forward with objections. Nevertheless, following PennEast's rebuttal, the Court provided individual Defendants with another opportunity to address the Court. At that point, Frances Silkotch and Gary Salata[22] spoke, expressing dissatisfaction with PennEast's attempts to negotiate. The April 19, 2018 hearing proceeded in the same manner, with the Court limiting the parties to new arguments and supplements to the record.[23] The following individuals addressed the Court: Michael Voorhees, Cynthia Niciecki, Leonard Goins, Michael

---

[20] The parties' specific arguments raised at the hearing are incorporated and discussed *infra*.

[21] Specifically, counsel spoke on behalf of the following Defendants: the State, NJCF, Hunterdon Land Trust, the Stark Defendants, the McKirdy Riskin Defendants, Mercer County, JCP&L, Kingwood Township, and Holland Township.

[22] Both Silkotch (Dkt No. 18-1765) and Salata (Dkt. No. 18-1918) are represented by counsel but, by invitation of the Court and with permission of counsel, spoke on behalf of themselves.

[23] Counsel spoke on behalf of the following Defendants: the Mullers, the Stark Defendants, the McKirdy Riskin Defendants, the De Sapio Defendants, NJCF, and the Hunterdon Land Trust.

and Maureen Santoro, Barbara Callahan, Janet Mowder, Gary Salata, Vincent DiBianca, Kevin Kuchinski, Jacqueline Evans, and Dan Mackey.[24]

Prior to the third and final hearing on April 26, 2018, the Court ordered PennEast to re-serve certain Defendants[25] it had not been able to personally serve and who had not otherwise appeared or filed a response to the Order to Show Cause.

Counsel had little to add to the oral record at the April 26, 2018 hearing. The following individuals addressed the Court: Michael Voorhees, Jackie Freedman on behalf of Woodside View Estates Homeowner's Association, and Joseph Caparoso.[26]

### G. Summation Briefs

Following the hearings, the Court ordered the parties to submit written summation briefs in lieu of closing oral arguments.[27] The Court received and carefully reviewed summation briefs

---

[24] Individual Defendants' arguments included but was not limited to dissatisfaction with PennEast's negotiation attempts, disagreement with PennEast's offer and valuation, objections to use of the United States Marshal Service, and objections to the route of the pipeline.

[25] Defendants are listed in Exhibit A to the April 20, 2018 Order. (*See* Dkt Nos. 18-1585; 18-1590; 18-1658; 18-1669; 18-1695; 18-1776; 18-1811; 18-1905; 18-1909; 18-1924 (having since been resolved); 18-1942; 18-1989; 18-2001; 18-2003; 18-2004; and 18-2025.)

[26] Voorhees and Freedman objected to their late service and notice of the hearings. Therefore, the Court permitted them three weeks to retain counsel or answer or otherwise respond to the complaint and Order to Show Cause.

[27] Following the submission of summation briefs, the D.C. Circuit, the Third Circuit, the District Court for the District of New Jersey, and the District Court for the Middle District of Pennsylvania issued pipeline-related decisions, including but not limited to *Delaware Riverkeeper Network v. Federal Energy Regulatory Commission*, 895 F.3d 102 (D.C. Cir. 2018); *Township of Bordentown v. Federal Energy Regulatory Commission*, 903 F.3d 234 (3d Cir. 2018); *New Jersey Conservation Foundation v. Federal Energy Regulatory Commission*, No. 17-11991, 2018 WL 5342833 (D.N.J. Oct. 29, 2018); *Transcontinental Gas Pipe Line Co., LLC v. 2.14 Acres*, 907 F.3d 728 (3d Cir. 2018); *Penneast Pipeline Company v. A Permanent Easement of 0.60 Acre ± And A Temporary Easement Of 0.60 Acre ± In Towamensing Township, Carbon County, Pennsylvania*, No. 18-281, 2018 WL 6304191 (M.D. Pa. Dec. 3, 2018) (granting motion for preliminary injunction); and *Penneast Pipeline Company v. A Permanent Easement of 0.60 Acre ± And A Temporary Easement*

from the following parties: PennEast, the State, NJCF, Hunterdon Land Trust, Mercer County, Cole of Hopewell, the De Sapio Defendants, the Stark Defendants, and the McKirdy Riskin Defendants.

### H. FERC Rehearing Requests and Denial

While PennEast was filing complaints in this Court based on the FERC Order, several Defendants petitioned for a rehearing of FERC's decision. After issuing tolling orders giving FERC additional time to review the rehearing requests[28], on August 10, 2018, "the requests for rehearing [were] rejected, dismissed, or denied and the requests for stay [were] dismissed as moot." FERC Order on Rehearing, Aug. 10, 2018 ¶ 4.

## II. JURISDICTION

### A. Under The NGA

This action is properly before this Court pursuant to 15 U.S.C. § 717f(h), which allows the holder of a certificate of public convenience and necessity to acquire the necessary right of way for a pipeline "by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located." Whether PennEast has established that it is entitled to this right—and Defendants argue it is not—is addressed below.

---

*Of 0.60 Acre ± In Towamensing Township, Carbon County, Pennsylvania*, No. 18-281, 2018 WL 6304192 (M.D. Pa. Dec. 3, 2018) (granting partial summary judgment). At the request of counsel or at the request of the Court, the parties supplemented their briefs when these decisions were issued, as well as when FERC issued its Order on Rehearing. Supplemental briefs were received almost monthly and as recently as December 10, 2018. This opinion has been revised to reflect these recent decisions, as well as the parties' responses thereto, as necessary.

[28] Pursuant to the NGA, rehearing requests are to be heard within thirty days. Despite this, courts have upheld the use of tolling order to grant FERC additional time to review the requests. Rehearing requests do not constitute stays of the FERC Order. *Delaware Riverkeeper Network*, 895 F.3d at 111; *Atl. Coast Pipeline, LLC Dominion Energy Transmission, Inc.*, 163 FERC ¶ 61098 (May 4, 2018).

## B. Eleventh Amendment Immunity

The State Defendants seek dismissal based on Eleventh Amendment immunity. An assertion of Eleventh Amendment immunity is a challenge to a district court's subject matter jurisdiction. *See Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 693 n.2 (3d Cir. 1996) ("[T]he Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction.") (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984)). Typically, when jurisdiction is challenged, the party asserting this Court's jurisdiction bears the burden of persuading the Court that subject matter jurisdiction exists. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991). However, because "Eleventh Amendment immunity can be expressly waived by a party, or forfeited through non-assertion, it does not implicate federal subject matter jurisdiction in the ordinary sense," and therefore, a party asserting Eleventh Amendment immunity bears the burden of proving its applicability. *Christy v. Pa. Turnpike Comm.*, 54 F.3d 1140, 1144 (3d Cir. 1994); *see also Carter v. City of Phila.*, 181 F.3d 339, 347 (3d Cir. 1999). Accordingly, the State Defendants must prove the Eleventh Amendment immunity's applicability in this case. For the reasons set forth below, the Court finds the State Defendants are not entitled to Eleventh Amendment immunity.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Courts have interpreted this to mean that State agencies and State officials acting in their official capacities cannot be sued under the principles of sovereign immunity and the Eleventh Amendment, subject to exceptions. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 (1989).

Fatally, the State Defendants concede their Eleventh Amendment immunity applies only to suits by private citizens (State Opp'n to Order to Show Cause 17) and that their arguments would be different if the United States government were pursuing eminent domain rights (Apr. 5, 2018 Hearing Tr. 34:9-17). Indeed, PennEast has been vested with the federal government's eminent domain powers and stands in the shoes of the sovereign. *City of Newark v. Cent. R.R. of N.J.*, 297 F. 77, 82 (3d Cir. 1924); *Georgia Power Co. v. 54.20 Acres of Land*, 563 F.2d 1178, 1181 (5th Cir. 1977); *City of Davenport v. Three Fifths of an Acre of Land*, 252 F.2d 354, 356 (7th Cir. 1958). The Court is not persuaded by the State Defendants' argument that the NGA is silent as to the rights of a private gas company; the NGA expressly allows "any holder of a certificate of public convenience and necessity" to acquire rights of way "by the exercise of the right of eminent domain" in this District Court.[29] 15 U.S.C. § 717f(h). As more thoroughly discussed below, PennEast holds a valid certificate as issued by the FERC Order. Therefore, the Eleventh Amendment is inapplicable, and the State Defendants are not entitled to immunity.[30] The State Defendants' request for dismissal for lack of jurisdiction based on Eleventh Amendment immunity is **DENIED**.

---

[29] Recently, and more to the point, the Third Circuit specifically stated, "Congress may grant eminent domain power to private companies acting in the public interest. . . . The NGA gives natural gas companies the power to acquire property by eminent domain . . . ." *Transcon. Gas Pipe Line Co.*, 907 F.3d at 728-29. *See also* FERC Order ¶ 41, 42 ("Congress made no distinction between for-profit and non-profit companies . . . . Once the Commission makes [a] determination [that the construction and operation of proposed interstate pipeline facilities are in the public convenience and necessity], it is section 7(h) of the NGA that authorizes a certificate holder to acquire the necessary land or property to construct the approved facilities by exercising the right of eminent domain if it cannot acquire the easement by an agreement with the landowner.")

[30] The Court is further persuaded by the State's apparent failure to raise this Eleventh Amendment argument in prior pipeline cases in this district.

### III. APPLICABLE PROCEDURE FOR PENNEAST'S CONDEMNATION APPLICATION

PennEast asks this Court: (1) to find it has satisfied the statutory requirements of the NGA under 15 U.S.C. § 717f(h) and is therefore vested with the authority to condemn the Rights of Way; (2) for an Order of Condemnation of the Rights of Way; and (3) to enter a preliminary injunction allowing immediate access to and possession of the Rights of Way because PennEast "has succeeded on the merits of its claim." (PennEast's Proposed Order 2-3.) Defendants argue PennEast's application is improper because, *inter alia*, PennEast is required to seek relief by way of summary judgment motion and that PennEast's request equates to a "quick-take" or immediate possession. Defendants further contend PennEast's application is improper because it does not comply with New Jersey state law. In response, PennEast claims the Court may—and indeed, must—summarily find the § 717f(h) factors are satisfied prior to and as part of the injunctive relief inquiry and that such a finding is not improper or premature. Additionally, PennEast argues the NGA preempts New Jersey state law.

#### A. Absence of Summary Judgment and Alleged Quick-Take

There is no doubt the NGA, "like most statutes giving condemnation authority to government officials or private concerns, contains no provision for quick-take or immediate possession." *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 822 (4th Cir. 2004); *accord Transcon. Gas Pipe Line Co.*, 907 F.3d at 728-29. However, it is also undeniable[31] that "a certificate of public convenience and necessity gives its holder the ability to obtain automatically the necessary right of way through eminent domain, with the only open issue being the compensation the landowner

_____

[31] Defendants challenge the effect of PennEast's FERC Certificate. This Court discusses and rejects these arguments *infra*. *See Columbia Gas Transmission, LLC*, 2015 WL 389402, at *3 & n.7-8; *infra* note 42 and text accompanying note 42.

defendant will receive in return for the easement." *Columbia Gas Transmission, LLC v. 1.01 Acres*, 768 F.3d 300, 304 (3d Cir. 2014). Courts are generally in agreement that, within this framework, immediate possession is permitted through a preliminary injunction without being considered a quick-take. *Transcon. Gas Pipe Line Co.*, 907 F.3d at 738-39;[32] *Sage*, 361 F.3d at 818, 824.

Therefore, the arguably novel question before this Court is whether PennEast was required to file a motion for summary judgment (or partial summary judgment) with respect to § 717f(h) before or in conjunction with its motion for a preliminary injunction.[33] For the reasons set forth

---

[32] The Third Circuit rejected landowners' argument that "because the NGA does not grant 'quick take' power, the statute does not permit immediate possession," stating:

> Nothing in the NGA suggests either explicitly or implicitly that the rules governing preliminary injunctions should be suspended in condemnation proceedings. . . .
>
> [W]e see no reason to read a repeal of Rule 65, governing preliminary injunctions, into the NGA. In fact, subsection (a) of Rule 71.1 incorporates the other Federal Rules of Civil Procedure— including the preliminary injunction rule, Rule 65—in condemnation proceedings to the extent Rule 71.1 does not govern. We do not so easily exterminate equitable remedies.

*Transcon. Gas Pipe Line Co.*, 907 F.3d at 738-39.

[33] The Third Circuit did not directly address this discreet issue in its recent *Transcontinental* opinion. *Transcon. Gas Pipe Line Co., LLC*, 907 F.3d at 734-35. There, plaintiff filed motions for a partial summary judgment and for a preliminary injunction. The district court in Pennsylvania granted partial summary judgment and, because it made a favorable decision on the merits in doing so, granted the preliminary injunction. On appeal, the Third Circuit found this did not constitute an impermissible quick-take. However, it did not specifically discuss whether anything less that summary judgment on plaintiff's substantive right to take would suffice. (*See id.* at 739 (agreeing with the Fourth Circuit's decision in *Sage* that immediate possession through a preliminary injunction was permissible in a condemnation proceeding, stating, "And this Court, too, albeit with less discussion, has ruled that where summary judgment is properly granted on a condemnation complaint, a preliminary injunction is appropriate as well. We effectively granted immediate access on the basis that the gas company had demonstrated success on the merits and strong arguments on the other prongs of the preliminary injunction test."). For the reasons set forth herein, the Court finds the Third Circuit's decision instructive here.

herein, the Court finds such a motion is not required in order for this Court to make a finding as to PennEast's substantive right to eminent domain under § 717f(h).

District courts in the Third Circuit have repeatedly granted immediate possession and preliminary injunctions without the benefit of summary judgment motions or briefings. *See, e.g., Columbia Gas Transmission, LLC v. 2.510 Acres of Land in the Borough of Swedesboro, Gloucester Cty.*, 86 F. Supp. 3d 291 (D.N.J. 2015); *Columbia Gas Transmission, LLC v. 1.092 Acres of Land*, No. 15-208, 2015 WL 389402 (D.N.J. Jan. 28, 2015); *Tennessee Gas Pipeline, LLC v. 1.693 Acres of Land in the Twp. of Mahwah*, No. 2:12-cv-07921, 2013 WL 244821 (D.N.J. Jan. 22, 2013); *Tennessee Gas Pipeline Co. v. 0.018 Acres of Land in Twp. of Vernon, Sussex Cty., N.J.*, No. 10-4465, 2010 WL 3883260 (D.N.J. Sept. 28, 2010); *Steckman Ridge GP, LLC v. An Exclusive Nat. Gas Storage Easement Beneath 11.078 Acres*, No. 08-168, 2008 WL 4346405 (W.D. Pa. Sept. 19, 2008). In each of these cases, the court first found "[p]laintiff had demonstrated an established right to condemn the landowner defendants' properties under the [NGA], 15 U.S.C. § 717f(h)," followed by a finding that "preliminary relief in the form of immediate possession was appropriate." *See Columbia Gas Transmission, LLC*, 86 F. Supp. 3d at 292–93 (citing *Columbia Gas Transmission*, 2015 WL 389402, at *3-5). This is precisely the procedure PennEast asks the Court to follow.[34]

Still, Defendants argue this seemingly standard procedure operates as an impermissible quick-take. The Court disagrees. The Third Circuit in *Transcontinental Gas Pipe Line Co.* recently confirmed there are two types of eminent domain:

One is "quick take," permitted by the [Declaration of Taking Act

---

[34] The pervasiveness of this practice is enough to convince the Court that this procedure is proper. However, the Court will address Defendants' arguments, particularly in light of *Transcontinental Gas Pipe Line Co.*, 907 F.3d 725.

("DTA")], 40 U.S.C. § 3114, in which the government files a "declaration of taking" that states the authority for the taking, the public use, and an estimate of compensation. Upon depositing the estimated compensation, title vests automatically with the United States. The other is standard condemnation, permitted by 40 U.S.C. § 3113, in which title passes and the right to possession vests after a final judgment and determination of just compensation. The procedures for standard condemnations are set forth in Fed. R. Civ. P. 71.1. The NGA is an example of a grant of eminent domain power from Congress to a private actor to condemn land for public use, but it only embodies the second type—standard condemnation power, not "quick take."

In the case before us, Transcontinental followed standard condemnation procedure. The company filed condemnation complaints under Rule 71.1, not a declaration of taking. Rule 71.1 has requirements that go beyond the DTA. Transcontinental followed these procedures by filing condemnation complaints under Rule 71.1; it then established its substantive right to the property by filing for summary judgment. Only after the District Court granted summary judgment in Transcontinental's favor did it grant injunctive relief. Transcontinental also posted bond at three times the appraised value of the rights of way, as required by the orders of condemnation. If Transcontinental had in fact exercised "quick take," it would have simply filed a declaration of taking with an estimate of compensation; title would have vested automatically. Here, unlike in a "quick take" action, Transcontinental does not yet have title but will receive it once final compensation is determined and paid. Unlike in a "quick take" action, the Landowners had the opportunity to brief the summary judgment motions and participate in the preliminary injunction hearing. The different procedures and opportunities for participation distinguish the grant of the injunction here from an exercise of "quick take" power.

*Transcon. Gas Pipe Line Co.*, 907 F.3d at 734-35 (footnotes omitted).

Against this background, it is undeniable PennEast is permissibly seeking condemnation under the NGA by way of a preliminary injunction and not by way of a quick-take under the DTA. The Third Circuit made clear that a quick-take under the DTA would have required "a declaration of taking with an estimate of compensation," and "title would have vested automatically." *Id.* at 735. Like Transcontinental, PennEast "filed condemnation complaints under Rule 71.1, not a

declaration of taking. . . . [I]t then[35] established its substantive right to the property. . . ." *Id.* at 734. And while the Third Circuit did not specifically address whether something less than summary judgment would suffice for determining whether a plaintiff's substantive rights under § 717f(h) of the NGA were satisfied, it indicated that its previous decisions to grant immediate access were based on "the gas company . . . demonstrat[ing] success on the merits and strong arguments on the other prongs of the preliminary injunction test." *Id.* at 739 (citing *Columbia Gas*, 768 F.3d at 315-16); *see supra* note 33. Therefore, the Court finds a summary judgment motion is not required to determine substantive rights for condemnation under NGA. All that is required is a finding, first, that the certificate holder has satisfied § 717f(h), demonstrating a success on the merits. Then, based on this finding "and strong arguments on the other prongs of the preliminary injunction test," a court may grant preliminary injunctive relief in the form of immediate possession. *Transcon. Gas Pipe Line Co.*, 907 F.3d at 739.

Nevertheless, Defendants argue PennEast's failure to file a summary judgment motion acts as a quick-take. The Court disagrees. Logically, if PennEast did not file a quick-take under the DTA and if there are only two types of eminent domain, it stands to reason PennEast filed its Condemnation Application under Rule 71.1 and the NGA. Failure to file a summary judgment motion does not convert PennEast's NGA condemnation action into a DTA quick-take, nor does it create a third type of eminent domain in contravention of Third Circuit directive. *Transcon. Gas Pipe Line Co.*, 907 F.3d at 736 ("To the contrary, we conclude that the equitable means by which Transcontinental's possession vested through the preliminary injunction differed in significant ways from 'quick take' under the DTA. We decline the invitation to conflate the two processes.

_____

[35] *See infra* Section IV (finding PennEast has established its substantive right to eminent domain under § 717f(h)).

These are not trivial differences of procedure or paperwork.").

Therefore, having found PennEast's Condemnation Application does not constitute an impermissible quick-take, and having found a summary judgment motion was not required to be filed as part of PennEast's request for orders of condemnation, the Court will, as other courts in this district have, evaluate and make a determination as to PennEast's substantive right to the property under § 717f(h) prior to reviewing the preliminary injunction motion.

## B. Applicability of State Law

Next, Defendants argue the substantive law of New Jersey does not conflict with federal law and therefore is not preempted. In particular, Defendants argue New Jersey state law requires good-faith negotiations before condemnations. And while the Court finds, *infra*, such an obligation does not exist under the NGA, the Court will address, generally, the issue of preemption.

Defendants argue that New Jersey law is controlling in this matter because § 717f(h) requires "[t]he practice and procedure in any action or proceeding for [the] purpose [of exercise of the right of eminent domain] in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated." However, Defendants fail to cite any New Jersey or Third Circuit law or case for this proposition.[36] Conversely, since the adoption of Federal Rule of Civil Procedure 71.1, the Third Circuit has ended its reliance on the state conformity language in the NGA upon which Defendants rely, expressly stating:

---

[36] To the extent Defendants disagree with the Third Circuit and the cases on which the Court relies (*see e.g.*, McKirdy Riskin Defs. Supp. Auth Ltr. dated Nov. 2, 2018), that argument is not persuasive. This Court "does not have the discretion to disregard controlling precedent simply because it [or a party] disagrees with the reasoning behind such precedent." *Vujosevic v. Rafferty*, 844 F.2d 1023, 1030 n.4 (3d Cir. 1988).

> Reliance on state eminent domain procedures ended with the
> adoption of Rule 71.1 (previously numbered 71A), which created a
> nationally uniform approach to eminent domain proceedings, and
> which, because it conflicted with § 717f(h), superseded the state-
> conformity language in the NGA. Courts now generally agree that
> condemnation proceedings under the NGA should follow Rule 71.1.

*Transcon. Gas Pipe Line Co.*, 907 F.3d at 738 (footnotes omitted); s*ee also Columbia Gas Transmission*, 2015 WL 389402, at *3 n.8 ("Federal Rule of Civil Procedure 71.1, however, supersedes the language in [§] 717f(h) to the extent it requires conformity with the state court "'practice and procedure'" concerning condemnation." (citation omitted)); *Steckman Ridge GP, LLC*, 2008 WL 4346405, at *3, *18 ("[T]he Third Circuit has determined that 'Congress intended to preempt state regulation of rates and facilities of natural gas companies and it [is] clear that the Natural Gas Act was intended by Congress to occupy the field.'" (quoting *Pa. Med. Soc. v. Marconis*, 942 F.2d 842, 847 (3d Cir. 1991)) (citing *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300-01 (1988))) (emphasis omitted); FERC Order ¶ 218 ("Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate. The Commission encourages cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.").[37]

Accordingly, the Court will proceed with its analysis under Rule 71.1, which allows for preliminary injunction proceedings under Rule 65, and § 717f(h) of the NGA.[38]

---

[37] Similarly, for these reasons, the Court finds the State's Farmland Preservation Programs and the law governing it, including but not limited to the Agriculture Retention and Development Act, N.J. Stat. Ann. 4:1C, *et seq.*, are preempted to the extent they conflict with the condemnation procedures set forth in NGA and Rule 71.1.

[38] *See supra* note 32.

# IV.    SUBSTANTIVE RIGHT OF EMINENT DOMAIN UNDER THE NGA

Pursuant to 15 U.S.C. § 717f(h):

> When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: Provided, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

Therefore, in order to condemn property, the petitioner must show: (1) that it is the holder of a FERC certificate of public convenience and necessity; (2) that it has been unable to acquire the necessary property interests by contract or agreement; and (3) that the alleged value of the property interest exceeds $3000. *Transcontinental Gas Pipe Line Co., LLC v. Permanent Easement for 2.59 Acres*, 709 F. App'x 109, 111 (3d Cir. 2017); *accord Columbia Gas Transmission, LLC*, 768 F.3d at 304. The Court addresses each element in turn.

## A.    FERC Certificate of Public Convenience and Necessity

PennEast maintains it is the holder of a valid FERC certificate—the FERC Order issuing blanket certificates—and that the scope of the FERC Order includes the properties against which it filed complaints.

Several Defendants argue, for a variety reasons, the FERC Order is not a final determination, while other Defendants concede it is. (*See, e.g.*, State Opp'n 9 ("The Order is a final

order, making it eligible for a rehearing request . . . .").)  The Court finds, for the reasons set forth

below, PennEast holds a final, valid FERC certificate upon which it can, and has standing to,

pursue its right of eminent domain. *Columbia Gas Transmission, LLC*, 768 F.3d at 304

("Accordingly, a certificate of public convenience and necessity gives its holder the ability to

obtain automatically the necessary right of way through eminent domain, with the only open issue

being the compensation the landowner defendant will receive in return for the easement.").

Pursuant to subsection (e) of 15 U.S.C. § 717f:

> [A] certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. *The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.*

(emphasis added).

Here, on January 19, 2018, after issuing a final EIS, FERC granted PennEast a Certificate

of Public Convenience and Necessity, exercising its right to attach conditions to the Certificate.

FERC Order ¶ 2. *See* 15 U.S.C. § 717f(e). These conditions do not undermine the finality of the

Certificate under § 717f(h) and were permitted under subsection (e). *See Penneast Pipeline Co.*,

2018 WL 6304192, at *3 ("'It is true that there are conditions in the FERC certificate that

[PennEast] will need to meet prior to commencing actual construction of the pipeline, but the

fulfillment of these conditions is not a prerequisite to [PennEast's] exercise of eminent domain';

if it were, some requirements—like surveying the property to comply with certificate conditions—

would never be met and as a result, the pipeline would never be built." (quoting *Transcon. Gas Pipe Line Co.*, 2017 WL 3624250, at \*6, *aff'd*, 907 F.3d 725 (3d Cir. 2018) (alterations in original)); *Constitution Pipeline Co. v. A Permanent Easement for 0.67 Acres & Temp. Easement for 0.68 Acres in Summit, Schoharie Cty., N.Y.*, No. 14-2023, 2015 WL 1638477, at \*2 (N.D.N.Y. Feb. 21, 2015) (holding that "the FERC Order cannot reasonably be read to prohibit [the gas company] from exercising eminent domain authority until it has complied with all conditions set forth in the Appendix" and rejecting "the argument that [the gas company] must wait until it has obtained a [Clean Water Act] 401 Certificate before it can initiate eminent domain proceedings").

Moreover, since the filing of this matter, FERC has reviewed and rejected, denied, or dismissed requests for a rehearing on the Order and, in another lengthy order with findings, affirmed its findings as set forth in the final EIS and the FERC Order. *See generally*, FERC Order on Rehearing. Notably absent from the many reasons the requests were rejected, denied, or dismissed was PennEast's alleged lack of a final certificate. Indeed, FERC treated the Certificate as final without question. *See, e.g.*, *id.* ¶ 5 (rejecting requests for a rehearing because "only a party to a proceeding has standing to request rehearing of a *final* Commission decision" (emphasis added)); *see also N.J. Conservation Found.*, 2018 WL 5342833, at \*11 n.12 (describing the PennEast FERC process as final and complete). This Court will do the same here and finds the Certificate to be final and valid.

Several Defendants argue the Certificate is "non-final" and is only an "incipient authorization without current force or effect." (*See, e.g.,* Stark Defs.' Opp'n 12-13.) That argument is misplaced, and the FERC orders cited in support thereof are inapposite. For example, in *Crown Landing LLC*, 117 FERC ¶ 61,209, at 62,106 (2006), on which Defendants rely, FERC denied rehearing and stated:

> The approval we issued in the June 20 Order is expressly conditioned upon completion of Crown Landing's remaining and unchallenged duties under [the Coastal Zone Management Act and the Clean Air Act]. Our order is an incipient authorization without current force and effect, since it does not yet allow Crown Landing to begin the activity it proposes[—*i.e.*, construction and operation of a pipeline].

*Id.* ¶ 21. The *Crown Landing* order[39] does not suggest the holder of the certificate cannot exercise its eminent domain rights consistent with the NGA, nor do Defendants provide FERC order or case that does.

The remaining arguments generally relate to the effect of the then-pending requests for rehearing. In light of FERC's Order on Rehearing, those arguments are moot.[40] To the extent Defendants argue the FERC Order and/or Certificate did not make a finding of public necessity, and is incomplete on those grounds, a clear reading of the FERC Order and final EIS adopted thereby, followed by the Rehearing Order, demonstrates FERC did, in fact, make such a finding.[41]

---

[39] The *Crown Landing* order goes on to say that "[c]onditional Commission orders have been described *in the context of constitutional standing analysis* as 'without binding effect,'" further distancing that FERC order from relevance to PennEast's case. *Id.* ¶ 21 n.27 (emphasis added) (citing *New Mexico Attorney Gen. v. FERC*, No. 04-1398, slip op. at 3 (D.C. Cir. October 13, 2006) (also discussing standing)).

[40] For example, the McKirdy Riskin Defendants argue FERC's approval was not final, and therefore not ripe for adjudication, because of the pending rehearing requests. That argument is moot in light of FERC Order on Rehearing.

[41] For this reason, the Court finds no merit in Defendants' argument that their Fifth Amendment rights are being violated by PennEast's failure to show the taking is for a public use. Specifically, FERC found the public convenience and necessity requires approval of the project, concluding:

> Based on the benefits the project will provide to the shippers, the lack of adverse effects on existing customers, other pipelines and their captive customers, and effects on landowners and surrounding communities, we find, consistent with the Certificate Policy Statement and section 7 of the NGA, that the public convenience and necessity requires approval of PennEast's proposal, subject to

This Court is not empowered to criticize that decision. *See* 15 U.S.C. § 717r(a), (b); *N.J. Conservation Found.,* 2018 WL 5342833, at *3; *Columbia Gas Transmission, LLC*, 2015 WL 389402, at *3 & n.7 ("Disputes over the reasons and procedures for issuing certificates of public convenience and necessity must . . . be brought before FERC.").[42]

Therefore, for the reasons set forth above, the Court finds PennEast is the holder of a Certificate of Public Convenience and Necessity and has satisfied that portion of the NGA.

### B.  Acquisition by Contract or Agreement

The next requirement under 15 U.S.C. § 717f(h) is that the holder of the certificate was not able to "acquire by contract, or [was] unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way." It is undisputed that PennEast has been unable to come to an agreement with the remaining Defendants.[43] Defendants argue, however, PennEast did not negotiate in good faith.[44] PennEast contends the NGA does not impose a good

---

the conditions discussed [in Appendix A].

FERC Order ¶ 40.

[42] Similarly, any arguments challenging FERC's procedures, including that FERC's use of tolling orders denied Defendants of due process in this proceeding, are beyond this Court's review. *See N.J. Conservation Found.,* 2018 WL 5342833, at *6 (finding no jurisdiction over a collateral attack on the FERC order or FERC's procedures).

[43] Since the filing of this case, PennEast has come to agreements with several property owners to allow the pipeline rights of way as requested in the Complaint. These matters have been dismissed in their entirety. In other cases, PennEast was able to reach agreements with one or more interest holder other than the property owner and, in those cases, those parties have been dismissed but the case remains active. For example, the interest holder may have discharged a mortgage, disclaimed an interest in the property, resolved its interest with PennEast or otherwise does not wish to participate.

[44] Some Defendants argue that the language used in PennEast's offers improperly sought permission for rights of way beyond what is permitted by § 717f(h). That argument is unsupported by facts or law and, based on the findings herein, is not dispositive. PennEast's "proposed orders simply cannot have the effect of granting any right of ingress or egress not approved by FERC."

faith negotiation requirement and, even so, relies on the certification of Daniel Murphy, a Project Manager for PennEast to demonstrate its efforts.

The Third Circuit has not taken a position on whether good faith negotiations are required,[45] and courts around the country are split. *Millennium Pipeline Co., L.L.C. v. Certain Permanent and Temporary Easements*, 777 F. Supp. 2d 475, 482-3 (W.D.N.Y. 2011) (citing *Maritimes & Ne. Pipeline, L.L.C. v. Decoulos*, 146 F. App'x 495, 498 (1st Cir. 2005)) (declining to require good faith); *Transcontinental Gas Pipe Line Co. v. 118 Acres of Land*, 745 F. Supp. 366,

---

*Mountain Valley Pipeline, LLC v. Easements to Construct, Operate, & Maintain a Nat. Gas Pipeline Over Tracts of Land in Giles Cty., Craig Cty., Montgomery Cty., Roanoke Cty., Franklin Cty., & Pittsylvania Cty., Virginia*, No. 17-0492, 2018 WL 1193021, at *2 (W.D. Va. Mar. 7, 2018) (quoting *Mountain Valley Pipeline, LLC v. Simmons*, No. 17-211, Dkt. No. 157 (N.D.W. Va. Feb. 20, 2018)). Defendants alternatively argue PennEast's parcel map and description of the Rights of Way was unclear as to the parcel to be acquired or that PennEast did not properly serve Defendants. The Court has reviewed the complaints, certifications, and maps and descriptions attached thereto, and finds notice and service to be satisfactory. *See* Fed. R. Civ. P. 71.1 (requiring "a description sufficient to identify the property" and "the interests to be acquired"); *Columbia Gas Transmission, LLC v. 370.393 Acres*, No. 14-0469, 2014 WL 5092880, at *12-13 (D. Md. Oct. 9, 2014). To the extent Defendants allege the descriptions are incorrect, vague, or ambiguous, PennEast will be able to amend the condemnation orders once it has accessed the property.

[45] While the Third Circuit has not made a specific finding regarding this requirement, it can be inferred there is no good faith requirement. In its October 30, 2018 *Transcontinental Gas Pipe Line Co.* Opinion, the court stated:

> The second and third requirements for using the eminent domain powers under § 717f(h) of the NGA are that the gas company negotiate with the landowner for the necessary right of way and that value of the right of way exceeds $3000. Transcontinental extended written offers of compensation exceeding $3000 to each of the Landowners, but these offers were not accepted.[] Transcontinental thus satisfied the second and third requirements.

*Transcon. Gas Pipe Line Co.*, 907 F.3d at 731 (footnote omitted) (citing declaration from senior land representative).

369 (E.D. La. 1990) (requiring good faith). Absent direction from the Third Circuit,[46] district courts in this circuit have declined to find such a requirement, noting "the plain language of the NGA does not impose an obligation on a holder of a FERC certificate to negotiate in good faith before acquiring land by exercise of eminent domain." *Transcontinental Gas Pipe Line Co. v. Permanent Easement for 0.78 Acres*, No. 17-0571, 2017 WL 3485755, at *3 (M.D. Pa. Aug. 15, 2017) (quoting *UGI Sunbury LLC v. A Permanent Easement for 0.4944 Acres*, No. 16-0783, 2016 WL 3254986, at *6 (M.D. Pa. June 14, 2016)) (*citing Steckman Ridge GP, LLC*, 2008 WL 4346405 at *13 n.3; *see also Kansas Pipeline Company v. A 200 Foot By 250 Foot Piece of Land*, 210 F. Supp. 2d 1253, 1257 (D. Kan. 2002)).

This Court is persuaded by the other district courts in this Circuit and finds no good faith requirement exists in the NGA.[47] *See Transcon. Gas Pipe Line Co.*, 2017 WL 3485755, at *3. Accordingly, PennEast need only show, quite simply, that it has been unable to acquire the property by contract or has been unable to agree with the owner of the property as to the compensation to be paid. *See* 15 U.S.C. § 717f(h); *Columbia Gas Transmission, LLC v. 76 Acres More or Less*, No. 14-110, 2014 WL 2919349, at *3 (D. Md. June 25, 2014) (rejecting the good faith requirement and finding plaintiff "need only show that it made an offer to the [d]efendants in order to demonstrate compliance with the second condition of [§] 717f(h). The burden to satisfy this condition is not onerous." (citing *E. Tenn. Natural Gas, LLC v. 1.28 Acres*, No. 06-0022, 2006 WL 1133874, at *29 (W.D. Va. Apr. 26, 2006))).

---

[46] *But see supra* note 45.

[47] Even if the NGA did require a showing of good faith, the Court finds such a requirement has been met. The Court is mindful of the impact this decision may have on property owners who have resided in their homes for years and have taken issue with the offers and forms of offers. Nonetheless, the Court finds PennEast has satisfied this portion of § 717f(h).

PennEast filed a declaration of Daniel Murphy in each case. Murphy is employed by Western Land Services ("WLS") as a Project Manager for the PennEast Pipeline Project and, in that capacity, oversees all communications with owners of property on the pipeline route. (Murphy Decl. ¶¶ 6-7.) These communications include negotiations for access to properties for surveys and to acquire the necessary rights of way. (*Id.* ¶ 7.) Specifically, Murphy supervises various land agents "who, over a period of more than three years, have made numerous contacts with [p]roperty [o]wners related to WLS's attempts on behalf of PennEast to obtain (1) property rights for the [p]roject and (2) access to conduct surveys and investigations." (*Id.* ¶ 8.) Based on the record before the Court describing the efforts of WLS[48], the Court finds PennEast has met its burden to "show that it made an offer to the [d]efendants," *Columbia Gas Transmission, LLC*, 2014 WL 2919349, at *3, and was not able to "acquire by contract, or [was] unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way," 15 U.S.C. § 717f(h).[49] Therefore, this factor is satisfied.

### C.  Property Value Exceeds $3000

The parties do not dispute the property value exceeds $3000. PennEast has made offers exceeding that amount (Murphy Decl. ¶ 19) and, as expected, Defendants do not argue their

---

[48] Including but not limited to numerous attempts to contact the property owners either through visits or by mail; failure to obtain permission for either survey access or to acquire an easement; and rejection of offers in excess of $3000. (*See* Murphy Decl. ¶¶ 16-21.)

[49] Several Defendants argue this burden is not met because PennEast did not attempt to negotiate with all interest holders. The Court disagrees. To satisfy its burden under § 717f(h), PennEast need only show it "cannot acquire by contract, or is unable to agree with the *owner* of property." (emphasis added). PennEast has met this burden. There is no obligation to make a showing as to all interest holders.

property is worth less. Therefore, this factor is satisfied for purposes of 15 U.S.C. § 717f(h).[50]

## V.    CONDEMNATION ORDER

Because PennEast has established it has a substantive right to eminent domain under § 717f(h), PennEast is "entitled to exercise eminent domain over the those [sic] specified portions of the landowner [d]efendants' properties, under the authority of the [NGA] and the FERC [C]ertificate," and the Court "may, under its equitable powers, enter an order of condemnation concerning the subject properties." *Columbia Gas Transmission*, 2015 WL 389402, at \*4 (citing *Sage*, 361 F.3d at 823); *accord Columbia Gas Transmission, LLC*, 768 F.3d at 304; *Columbia Gas Transmission, LLC v. 2.510 Acres of Land in the Borough of Swedesboro, Gloucester Cty.*, 86 F. Supp. 3d 291 (D.N.J. 2015); *Tennessee Gas Pipeline, LLC v. 1.693 Acres of Land in the Twp. of Mahwah*, No. 12-07921, 2013 WL 244821 (D.N.J. Jan. 22, 2013). Therefore, PennEast's request for orders of condemnation is **GRANTED**.

The next question is "whether such right entitles [PennEast] to intermediate, equitable relief in the form of immediate possession." *Columbia Gas Transmission*, 2015 WL 389402, at \*4. Having found injunctive relief is an appropriate remedy in condemnation actions, *see supra* Section III.A, the only remaining question is whether PennEast meets its burden in "demonstrat[ing] success on the merits and strong arguments on the other prongs of the preliminary injunction test." *Transcon. Gas Pipe Line Co.*, 907 F.3d at 738-39. For the reasons set forth below, the Court finds injunctive relief in the form of immediate possession is warranted.

## VI.    INJUNCTIVE RELIEF

To obtain a temporary restraining order or preliminary injunction, the moving party must

---

[50] *See also supra* note 45.

show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted. . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179. Significantly, a motion for injunctive relief following a determination of plaintiff's substantive right to eminent domain

> is not a "normal" preliminary injunction, where the merits await another day. In those situations, the probability of success is not a certainty such that weighing the other factors is paramount. Here, there is no remaining merits issue; we have ruled that [plaintiff] has the right to the easements by eminent domain. The only issue is the amount of compensation— . . . the result of which can have no affect on [plaintiff]'s rights to the easements. That [plaintiff]'s entitlement to relief comes in the form of injunctive relief should not dictate that we impose similar constraints on our grant of that relief in this context.

*Columbia Gas Transmission, LLC*, 768 F.3d at 315. Against this landscape, the Court weighs the injunctive relief factors.

## A. Reasonable Probability of Eventual Success in the Litigation

PennEast has more than established reasonable probability of success on the merits; indeed, the Court has found PennEast satisfied the elements of § 717f(h) and is therefore entitled to condemnation orders. Accordingly, the Court finds this factor is satisfied and weighs in favor of

granting the preliminary injunction. *See Columbia Gas Transmission*, 2015 WL 389402, at *4

(citing *Columbia Gas Transmission*, 768 F.3d at 314-15; *Steckman Ridge*, 2008 WL 4346405, at

*15).

### B. Irreparable Harm

PennEast argues it requires immediate access to and possession of the Rights of Way in

order to meet the FERC-mandated in-service date of January 1, 2020. In support thereof, PennEast

provided the certification of Jeffrey D. England, Manager, Project Management and Construction

of UGI Energy Services, LLC on behalf of PennEast. (England Cert.) England states, "PennEast

has entered into precedent agreements with seven foundation shippers and eleven shippers in total,

which combined have committed to purchase 975,000 dekatherms per day of the natural gas to be

supplied by the [p]roject. These precedent agreements are based on the [p]roject being in service

by certain dates." (*Id.* ¶ 9.) While the Court understands Defendants' objections,[51] courts have held

that a financial loss may be sufficient to establish irreparable harm "if the expenditures cannot be

recouped," such as where the delay would prevent the pipeline company from completing

necessary pre-construction survey and conditions or could cause the company to breach contracts

with subcontractors and vendors. *See Transcon. Gas Pipe Line Co.*, 709 F. App'x at 112-13;

*Columbia Gas Transmission, LLC*, 768 F.3d at 315-16; *Penneast Pipeline Co.*, 2018 WL 6304191,

at *2; *Columbia Gas Transmission, LLC*, 2015 WL 389402, at *4; *Tennessee Gas Pipeline Co.*,

---

[51] Defendants argue the in-service date is not a hard deadline by which the project must be built; rather it is "simply FERC's inclusion of PennEast's anticipated length of project completion, to ensure that its nascent authorization does not languish indefinitely while an applicant sits on its rights," and, to the extent PennEast is bound by the timeline, "FERC can and routinely does grant extensions upon simple request." (*See* Stark Defs.' Br. 28-29.) While this may be true, the Court is persuaded by its sister courts' findings which respect to the matter, cited herein, and, nevertheless, finds additional irreparable injuries on which it bases its decision.

2010 WL 3883260, at *2-3. (*See also* England Decl. ¶ 29 ("If PennEast is unable to complete these activities in an expeditious manner, the project will be delayed causing PennEast irreparable harm in terms of lost contracts . . . .").)

Moreover, FERC has tasked PennEast with a number of environmental conditions which must be satisfied before PennEast can begin construction. Many of these conditions require immediate access to the properties, including but not limited to Conditions 3, 4, 6, 10, 15-17, 21, 23, 30-32, 35, 39, 41, 47, and 51. (England Cert. ¶ 18 (citing FERC Order, App'x A).) Immediate access will additionally allow PennEast to survey and collect information needed to complete its Application to the DEP for a Freshwater Wetlands Individual Permit and Water Quality Certificate. (*Id.* ¶ 17.)

Defendants argue PennEast's lack of DEP approval is grounds for this Court to deny injunctive relief. The Court is not persuaded by this chicken-and-egg argument. The DEP is requiring that PennEast have 100% of the surveys "completed before the agency will undertake to complete its review and render decisions on the Permit and Certificate Application." (*Id.* ¶ 22.) Therefore, the Court finds PennEast will be irreparably harmed if it is not granted immediate access to the properties to begin surveys, complete its DEP Application, and satisfy FERC's Environmental Conditions.[52] *See Constitution Pipeline Co.*, 2015 WL 1638477, at *2 (holding that "the FERC Order cannot reasonably be read to prohibit [the gas company] from exercising eminent domain authority until it has complied with all conditions set forth in the Appendix" and rejecting

---

[52] To the extent the State Defendants argue this preliminary relief will cause irreparable harm and is against the stated policies of the State, the Court has already found that the condemnation procedures under the NGA and Rule 71.1 preempt any proscriptions regarding eminent domain conveyance set forth in the State law.

"the argument that [the gas company] must wait until it has obtained a CWA 401 Certificate before it can initiate eminent domain proceedings").[53]

Accordingly, this factor weighs in favor of granting the preliminary injunction.

### C. Balancing Against Harm to Defendants

This Court has heard, reviewed, and carefully considered a wide range of arguments from Defendants regarding the harm PennEast's possession will cause, many of which have already been addressed.[54] Other arguments, however, relate to the value of the property and just

---

[53] On December 3, 2018, the District Court for the Eastern District of Pennsylvania issued opinions pertaining to PennEast's motions for summary judgment and injunctive relief. *Penneast Pipeline Co.*, 2018 WL 6304191 (granting motion for preliminary injunction); *Penneast Pipeline Co.*, 2018 WL 6304192 (granting partial summary judgment). In granting summary judgment, the court denied any argument that the FERC Order was not final because, *inter alia*,

> If the FERC certificate was to be interpreted as requested by [defendant], no entry onto private property could take place before all pre-conditions were met, and yet, many of the pre-conditions cannot be met without access to the property. This contorted reasoning would make the FERC certificate nothing more than a meaningless piece of paper. Said another way, such action would effectively preclude PennEast from ever being able to submit a completed application to the PADEP. Since the approval of the PADEP is a condition of the FERC certification that must be met prior to receiving authorization to begin construction of the pipeline, without access to the [defendant's] property, PennEast will never be able to fulfill the necessary preconditions and receive those approvals. Such a result would make a mockery of the process.

*Penneast Pipeline Co.*, 2018 WL 6304192, at *4. In its opinion granting PennEast's motion for a preliminary injunction, with respect to irreparable harm, the court noted that "[m]any of [defendant's] arguments are identical to those raised in opposition to partial summary judgment and have already been addressed in a separate memorandum issued today." The aforementioned portion of the summary judgment decision is particularly applicable to the irreparable harm analysis for injunctive relief. To that end, this Court agrees with the conclusions of the Eastern District of Pennsylvania.

[54] For example, Defendants argue PennEast is in violation of the Fifth Amendment because it cannot show the taking is for a public use and because the FERC Order is non-final. The Court has

compensation for same. Because this is not a quick-take under the DTA, PennEast is not required to deposit an estimated compensation,[55] which would cause title to pass automatically. This action is proceeding under Rule 71.1 and the NGA, and title will not pass until this Court has entered a final judgment and determination of just compensation. That determination is not before this Court at this time. *See Transcon. Gas Pipe Line Co.*, 907 F.3d at 735 ("Here, unlike in a 'quick take' action, Transcontinental does not yet have title but will receive it once final compensation is determined and paid."); *Columbia Gas Transmission, LLC*, 768 F.3d at 304 ("[A] certificate of public convenience and necessity gives its holder the ability to obtain automatically the necessary right of way through eminent domain, with the only open issue being the compensation the landowner defendant will receive in return for the easement.").

---

already dismissed both arguments. *See supra* Section IV.A and note 41. And while the Court is aware of Defendants' concerns related to Constitution Pipeline's inability to obtain a permit under section 401 of the CWA after it took possession, *see Constitution Pipeline Co. v. New York State Dep't of Envt'l Conservation*, 868 F.3d 87 (2d Cir. 2017), the Court again finds it is not persuaded by this chicken-and-egg argument. *See Constitution Pipeline Co.*, 2015 WL 1638477, at *2 (rejecting defendants' argument regarding the CWA permit). Here, PennEast cannot attempt to obtain its permits without access, nor can it provide more adequate descriptions of the work to be completed on the individual parcels, until it is granted access. *See id.* and *supra* note 53. Having satisfied its substantive rights under § 717f(h), PennEast is entitled to a condemnation order and possession; granting preliminary relief only permits access sooner. Therefore, Defendants' request to grant some form of interim possession pending satisfaction of the permits is inherently granted to the extent that title and permanent possession will not transfer until this Court has entered a final judgment and determination of just compensation. *See Transcon. Gas Pipe Line Co.*, 907 F.3d at 734.

[55] While PennEast will not be required to deposit an estimated compensation, they will be required to post a bond in order to obtain a preliminary injunction. The Third Circuit recently rejected the argument that depositing a bond and entering a preliminary injunction equates to a quick-take, because PennEast "does not yet have title but will receive it once final compensation is determined and paid." *Transcon. Gas Pipe Line Co.*, 907 F.3d at 735-36 ("[W]e conclude that the equitable means by which Transcontinental's possession vested through the preliminary injunction differed in significant ways from 'quick take' under the DTA. We decline the invitation to conflate the two processes. These are not trivial differences of procedure or paperwork.").

With respect to Defendants' argument that they will be harmed by the presence of the United States Marshal Service ("USMS"), the Court reminds Defendants, as it did at the public hearings, that the Court will not be granting PennEast or the USMS permission to stand guard on individuals' property. The order allows for PennEast to call upon the USMS in the event this Court's order is violated and PennEast is actively prohibited from entering the property.[56] The Court finds Defendants will not be harmed by PennEast's mere ability to call upon the USMS to enforce the order.

Ultimately, Defendants will not be harmed by the Court granting immediate possession.[57] While the Court is sympathetic to each property owners' individual interests, the taking of property can be monetarily compensated. *Transcon. Gas Pipe Line Co.*, 709 F. App'x at 112. ("[T]he impact of the taking . . . is an issue for the determination of just compensation."); s*ee Columbia Gas Transmission, LLC*, 2015 WL 389402, at *4 (citing *Columbia Gas Transmission, LLC*, 768 F.3d at 316; *Steckman Ridge GP, LLC*, 2008 WL 4346405, at *16). Therefore, this factor weighs in favor of granting the preliminary injunction.

---

[56] At the hearing, counsel for PennEast stated:

> [W]hat we're asking for is if somebody is put in danger, if somebody violates the Court order, that PennEast can make an application to the federal marshals to have the marshals investigate that. They're not going to stand on the property with automatic weapons. They're going to investigate whether someone is violating the court order and then execute, if they need to, as they would to enforce any other order of this Court.

(Apr. 19, 2018 Hearing Tr., 16:3-11.)

[57] Even if the Court were to find the harm to Defendants weighed against possession, the balance of the remaining equitable factors still weighs in favor of awarding PennEast a preliminary injunction for immediate possession of the Rights of Way.

### D. Public Interest

By granting the certificate, FERC made a determination that the pipeline is necessary and in the public interest.[58] This conclusion was reached after an extensive administrative process that weighed the harm to the public against the need for the pipeline.[59] The FERC Order issued the Certificate contingent upon PennEast complying with certain conditions in order to address these concerns, and FERC reviewed and rejected, denied, or dismissed requests for a rehearing on the Order, affirming its findings as set forth in the final EIS and the FERC Order. *See generally*, FERC Order on Rehearing. The Court is persuaded by FERC's finding that "the public convenience and necessity requires approval of PennEast's proposal, subject to the conditions discussed [in Appendix A]." FERC Order ¶ 40. As already discussed, any challenges to FERC's findings are not properly before this Court. *Columbia Gas Transmission, LLC*, 2015 WL 389402, at *3 & n.7-8.

Therefore, this factor weighs in favor or granting the preliminary injunction.

### VII. BOND

Pursuant to Federal Rule of Civil Procedure 65(c), "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In the context of eminent domain proceedings under the NGA, this amount serves as a safeguard to protect the landowner. *Sage*, 361 F.3d at 826. For example,

> if the gas company's deposit (or bond) is less than the final
> compensation awarded, and the company fails to pay the difference
> within a reasonable time, "it will become a trespasser, and liable to

---

[58] *See supra* note 41 and text accompanying note 41.

[59] *See supra* Section I.B.

be proceeded against as such." *Cherokee Nation*[ *v. S. Kan. Ry. Co.*], 135 U.S. [641,] 660, 10 S. Ct. 965 [(1890)]. Likewise, if a FERC-regulated gas company was somehow permitted to abandon a pipeline project (and possession) in the midst of a condemnation proceeding, the company would be liable to the landowner for the time it occupied the land and for any damages resulting to the [land] and to fixtures and improvements, or for the cost of restoration." 4 J. Sackman, Nichols on Eminent Domain § 12E.01 [07] (rev.3d ed).

*Id.* at 825–26.

PennEast asks the Court to set the bond in the amount of the appraised value for the Rights of Way as determined by the independent appraiser retained by PennEast. Defendants ask for a larger bond amount based on the market value of the entire property and contemplating the loss of use of the property and well as construction and rebuilding costs.

The amount of the bond must be reasonably related to the property interest at issue. Often, this amount is two or three times the appraisal value provided by plaintiff's appraiser. *See, e.g., Transcon. Gas Pipe Line Co.*, 907 F.3d at 735 (posting a bond at three times the appraised value of the rights of way); *Transcon. Gas Pipe Line Co.* v. *Permanent Easement for 0.16 Acres*, No. 17-0545, 2017 WL 3412375 at *10 (M.D. Pa. August 9, 2017) (requiring plaintiff to post bond based on three times the appraisal value of the easement); *In re Transcon. Gas Pipeline Co.*, No. 16-02991, 2016 WL 8861714 at *11 (N.D. Ga. Nov. 10, 2016) (requiring a bond of twice the appraisal value of the easement); *Sabal Trail Transmission, LLC v. Real Estate*, No. 16-cv-97, 2016 WL 3248367 at *6 (M.D. Ga. June 10, 2016) (setting the amount of security bond at twice market value of the easement).

Accordingly, PennEast will be required to post a bond in an amount totaling three times the appraised value of the Rights of Way.

# VIII.  CONCLUSION

To be clear, this Court is not entering a final judgment, granting a permanent injunction, or permitting construction to start prior to PennEast satisfying the environmental conditions in the FERC Order. Rather, this Court finds: (1) PennEast is entitled to the condemnation orders pursuant to § 717f(h); and (2) they are entitled to them on an immediate and expedited basis having appropriately sought such relief under Rule 65. *See Transcon. Gas Pipe Line Co.*, 907 F.3d at 736, 738-39 (finding preliminary injunctions under Rule 65 are permissible under the NGA and do not constitute a quick-take so long as condemnation orders have been obtained); *Columbia Gas Transmission, LLC*, 86 F. Supp. 3d at 292–93 (finding "[p]laintiff had demonstrated an established right to condemn the landowner defendants' properties under the [NGA], 15 U.S.C. § 717f(h)," and finding that "preliminary relief in the form of immediate possession was appropriate") (citing *Columbia Gas Transmission*, 2015 WL 389402, at *3-5).

Final judgment under Rule 71.1 and the NGA will be entered following a decision on just compensation; title will transfer upon payment of the adjudicated just compensation amount. *See Transcon. Gas Pipe Line Co.*, 907 F.3d at 734-35. PennEast remains bound by the FERC Order and the conditions therein.

Accordingly, for the reasons set forth above and for good cause shown, the State Defendants' request for dismissal is **DENIED**; PennEast's application for orders of condemnation and for preliminary injunctive relief allowing immediate possession of the Rights of Way in advance of any award of just compensation is **GRANTED**.

Further, the Court, on its own motion, hereby appoints as Special Masters/Condemnation Commissioners the Honorable James R. Zazzali, C.J. (ret.); the Honorable Joel A. Pisano, U.S.D.J. (ret.); the Honorable Kevin J. O'Toole; Joshua Markowitz, Esq.; and Shoshana Schiff, Esq. to

adjudicate and determine the quantum of just compensation.

Appropriate orders will follow.


Date: December 14, 2018                    */s/Brian R. Martinotti*
                                           **HON. BRIAN R. MARTINOTTI**
                                           **UNITED STATES DISTRICT JUDGE**